IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| APRIL MCBRIDE et al., | : | |
| *Plaintiffs*, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CHILDREN'S HOSP. of PA. et al., | : | No. 14-2301 |
| *Defendants*. | : | |

**MEMORANDUM**

PRATTER, J.                                                                                                                                   JUNE 3, 2015

April McBride and Wilhelmina Saddler claim that their employer, Children's Hospital of Pennsylvania and various of its subsidiaries and employees (jointly "CHOP"), refused to let them, two African American employees, work from home while recovering from surgery, while at the same time allowing a white employee to work from home while she recovered from surgery. CHOP has moved for summary judgment, arguing that Ms. McBride and Ms. Saddler have failed to show that CHOP's legitimate, nondiscriminatory reason for treating its employees differently was mere pretext. Having heard oral argument on May 22, 2015 and reviewed the written filings, the Court will grant the defense motion in its entirety.

**BACKGROUND**

During the time period relevant to this action, April McBride and Wilhelmina "Brenda" Saddler, both African American women, were employed by CHOP as medical abstractionists, or billing coders. More specifically, Ms. McBride worked for Children's Health Care Associates ("CHCA"), and Ms. Saddler worked for Radiology Associates of CHOP ("RACH"). Both of these entities are subsidiaries of CHOP. As medical abstractionists, Plaintiffs reviewed medical charts and applied codes for procedures and diagnoses; those codes then became a part of the bills for medical services.

1

*A. Ms. McBride*

After working in other positions at CHOP, Ms. McBride was hired as a medical abstractionist by CHCA on September 26, 2009. After completing approximately one year of service with CHCA, Ms. McBride was permitted to work from home three days per week, like other members of her department. In late March, 2011, CHCA notified employees that, effective May 2, 2011, the work-from-home policy would end and that the policy change was the result of changes that would be implemented in the medical coding system at the federal government level.[1] Ms. McBride notified the Human Resources department on April 19, 2011, that she would not be able to report to work in the office by May 2, 2011, as she had childcare issues that she had not been able to resolve in time to return to the office full time. She was permitted to continue to work from home while resolving those issues.

During that same time period, Ms. McBride requested continuous FMLA leave from May 25, 2011, through June 10, 2011, in order to undergo and recover from abdominal surgery. Ms. McBride submitted her leave request to Unum, CHOP's third party insurance provider and FMLA administrator, and she was approved for continuous FMLA leave through June 10, 2011 and short term disability through June 14, 2011. When an employee is approved for continuous FMLA leave, it means that both Unum and the employee's doctor agree that the employee is unable to work at all for that time period, and, consequently, CHOP does not permit employees on continuous FMLA leave to work at all, even from home. Ms. McBride states that she asked her supervisor, Eleanor Sclocchini, if she could work from home during her recovery and was told she could not do so, but the precise timing and context of that request are unclear.

---

[1] Defendant Ellen Coffee, the supervisor of Plaintiffs' manager, also testified at her deposition that she perceived a productivity issue with employees working from home, but that the overarching reason for the change in the work-from-home policy was the nomenclature change.

2

Originally, Ms. McBride was cleared to return to work on June 14, 2011 with a five-pound lifting restriction, or what her doctor termed "light duty." Eleanor Sclocchini, Ms. McBride's immediate supervisor and a defendant in this action, told Ms. McBride she could not work from home with this restriction, as working from home required carrying a laptop and documents weighing more than five pounds between the office and home. Ms. McBride testified at her deposition and stated in an affidavit that the real problem with working in the office at that time was not lifting, but rather the commute to and from the office and the need to take breaks to rest; however, she does not appear to have communicated this to anyone at CHOP or Unum, and it does not appear that her doctor did so.

When Ms. McBride was informed that she could not work from home, she told Ms. Sclocchini that she was actually not cleared to work at all. However, she had no medical documentation to support this statement, and therefore was told to return to work. She called out for June 16 and 17, came in on June 20 but left early due to pain, worked on June 21, and called out June 22-24. As a result of these absences and other unplanned days off, Ms. McBride was given an oral warning on July 28, 2011 by Ms. Sclocchini for violating CHOP's policy prohibiting more than six unscheduled paid personal leave days within a 12-month period. Ms. McBride complained that the oral warning discipline was improper. After a meeting with Human Resources and an investigation spurred by her insistence, during which it was determined that she was entitled to medical leave for many of the unplanned days off, the discipline was revoked.[2]

---

[2] Ms. Sclocchini resigned the day after the Human Resources meeting.

On February 27, 2015, almost a year after this case was filed, Ms. McBride was terminated as a part of a reduction in force at CHCA.[3]

*A. Ms. Saddler*

Ms. Saddler began working at CHOP as a medical abstractionist on April 23, 2007. Although she was not working pursuant to a work-from-home policy, Ms. Saddler was occasionally permitted to work from home for non-medical reasons, such as to wait for deliveries or prepare for church functions. On April 18, 2011, Ms. Saddler applied for continuous FMLA leave and short-term disability for foot surgery. Unum approved her leave on April 20, 2011, permitting her continuous FMLA leave from April 13 through April 26, 2011. At some unspecified point prior to her leave, Ms. Saddler asked to work from home during her recuperation, and she did so again by email during her leave. Ms. Sclocchini replied to that email that allowing her to work at all during continuous FMLA leave would be an HR issue.

Ms. Saddler continues to work at CHOP.

*B. Ms. Ash-Heriegel*

Both Plaintiffs base their claims on their allegation that Nancy Ash-Heriegel, a fellow medical abstractionist and a white female, was permitted to work from home during her recuperation from foot surgery from February, 2012, through May, 2012. By the time of Ms. Ash-Heriegel's leave, Ms. Sclocchini, the supervisor most directly involved with Plaintiffs' leave requests in 2011, had resigned, and Ellen Coffee, Ms. Sclocchini's supervisor, was dealing with leave issues. Prior to formally requesting FMLA leave from Unum, Ms. Ash-Heriegel had a meeting with Ellen Coffee to discuss leave options and the possibility of working from home. Although Plaintiffs insist that Ms. Ash-Heriegel received approval to work from home during

---

[3] Although Ms. McBride does allege generally a retaliation claim in the Complaint, she has not moved to amend the Complaint to include her termination as part of that claim. The Court will discuss this issue further, *infra*, in its discussion of the retaliation claim.

that meeting, the record does not support that inference. Based on the record, at most she received at that time tacit approval, pending a decision from Unum and her doctor on what type of leave was appropriate. Ms. Ash-Heriegel then submitted medical documentation to Unum requesting continuous FMLA leave for a short period and intermittent FMLA leave thereafter, during which her doctor specifically recommended that she work from home. Ms. Ash-Heriegel testified at her deposition that she would have needed continuous leave if she had not been permitted to work from home. Ms. Coffee testified that she approved Ms. Ash-Heriegel's request to work from home based on Unum's approval of intermittent leave and Ms. Ash-Heriegel's doctor's express request. During the time she worked from home on intermittent leave, Ms. Ash-Heriegel continued to accrue certain benefits, including vacation days and the like. Ms. Ash-Heriegel is still employed by CHOP.

In late 2012, the work-from-home policy was reintroduced, allowing all medical abstractionists to work from home on a regular basis.

Plaintiffs filed complaints with the PHRC and EEOC in May of 2012, alleging disparate treatment based on race. After receiving right to sue letters, they filed this complaint on April 21, 2014. Both Plaintiffs claim that the CHOP Defendants discriminated against them in violation of 42 U.S.C. § 1981 and Title VII, and that they were subjected to a hostile work environment. Ms. McBride also alleges that she was the victim of retaliation in violation of 42 U.S.C. § 1981. Defendants move for summary judgment on all of these claims. At oral argument, Plaintiffs conceded that they have no viable hostile work environment claim, so the following discussion will be limited to disparate treatment and retaliation.

**LEGAL STANDARD**

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks,* 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson,* 477 U.S. at 248). Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. *See Anderson,* 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.,* 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility for informing the court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P.

56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

**DISCUSSION**

    A. *Disparate Treatment (42 U.S.C. § 1981 and Title VII)*[4]

Where there is circumstantial evidence of discrimination, as will be accepted for analytical purposes in this case, courts apply the burden-shifting framework from *McDonnell Douglas v. Green,* 411 U.S. 792 (1973). Under *McDonnell Douglas,* a plaintiff may establish a *prima facie* discrimination claim by showing that (1) she belongs to a protected class; (2) she was qualified for a position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances that raise an inference of discrimination. *See Sarullo v. U.S. Postal Serv.,* 352 F.3d 789, 797 (3d Cir. 2003). If a plaintiff establishes a *prima facie* case of discrimination, the defendant must "articulate some legitimate, nondiscriminatory reason for the adverse employment action." *Doe v. C.A.R.S. Prot. Plus, Inc.,* 527 F.3d 358, 370 (3d Cir. 2008). The plaintiff then has the burden of showing that the defendant's proffered reasons for the adverse action are pretextual. At the summary judgment stage, the plaintiff must meet this burden by submitting "evidence which (1) casts doubt upon the legitimate reason proffered by the employer such that a fact-finder could reasonably conclude that the reason was a fabrication; or (2) would allow the fact-finder to infer that discrimination was more likely than not a motivating or determinative cause of the employee's termination." *Id.* (citing *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994)). The plaintiff must "present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision." *Kautz v. Met–*

---

[4] Disparate treatment claims are subject to the same analysis under either 42 U.S.C. § 1981 and Title VII. *See Brown v. J. Katz, Inc.,* 581 F.3d 175, 181–82 (3d Cir. 2009).

*Pro Corp.,* 412 F.3d 463, 467 (3d Cir. 2005). Finally, in deciding a dispositive motion under the *McDonnell Douglas* framework, the Court recognizes that "evidence supporting the *prima facie* case is often helpful in the pretext stage, and nothing about the *McDonnell Douglas* formula requires [the Court] to ration the evidence between one stage or the other." *Doe,* 527 F.3d at 370.

CHOP argues that, even assuming that Plaintiffs set forth a *prima facie* case (which they note is not certain, as they claim it is not clear that not being permitted to work from home is an adverse employment action),[5] Plaintiffs cannot show that CHOP's legitimate, nondiscriminatory reason for treating them differently from Ms. Ash-Heriegel was a pretext. CHOP contends that both Unum and Plaintiffs' physicians certified that Plaintiffs could not work at all and thus needed continuous FMLA leave, while Ms. Ash-Heriegel's doctor had specifically recommended that she work from home during intermittent FMLA leave. Indeed, Defendants argue that they could not have allowed Plaintiffs to work from home, as Plaintiffs' own doctors had offered opinions that they could not work at all during the course of their leaves. There is indeed no evidence in the record that Plaintiffs' doctors ever certified or recommended that they work from home but not in the office. Moreover, even though Ms. McBride states that the main problem with returning to work after her surgery was the commute, there does not appear to be any evidence that either she or her doctor ever communicated that distinction to Unum or CHOP.

Plaintiffs counter that if they were told that working from home was an option, they could have asked their doctors to clear them for that. They argue that Ms. Ash-Heriegel was told before applying for leave that working from home was a possibility, while they were told that

---

[5] *See, e.g., Daniels v. Fed. Reserve Bank of Chicago*, 2006 WL 861969, at *12 (N.D. Ill. Mar. 31, 2006) (holding that allowing white employee to work from home while recovering from surgery while not allowing African American employee to do so did not amount to an adverse employment action). *But see Seldon v. Nat'l R.R. Passenger Corp.*, 452 F. Supp. 2d 604 (E.D. Pa. 2006) (holding that a refusal to allow an employee to work from home could be an adverse employment action).

working from home was not a possibility. However, Plaintiffs have presented no evidence that their doctors would have supported that request. Indeed, the certification from Ms. McBride's doctor, for instance, stated that she could not work at all due to pain and the effects of pain medication, issues unlikely to be resolved simply by eliminating a commute.

There are questions raised here about whether Ms. Ash-Heriegel was counseled by Defendants in such a way that she was able to secure doctor's recommendations that allowed her to work from home, while Plaintiffs were not expressly presented with that option. However, the approval of Plaintiffs' doctors for working from home is simply speculative. It does not appear that Plaintiffs' doctors were deposed, and their contemporaneous certifications do not say anything about working from home (or even, as previously noted, state anything that would suggest that working from anywhere would have been advisable). At most, the Court has Plaintiffs' surmising as to what their doctors might have done. In the absence of actual evidence supporting Plaintiffs' argument that their doctors would have cleared them to work from home had they been given that option or that they expressed to CHOP any medical evidence of the same at the time, the Court finds that Plaintiffs have not carried their burden of casting doubt on Defendants' proffered legitimate, nondiscriminatory reason for the alleged different treatment of Ms. Ash-Heriegel.[6] As a result, the Court will grant Defendants' motion for summary judgment on these claims.

---

[6] In addition to the difference in the type of FMLA leave the Plaintiffs applied for and that granted to Ms. Ash-Heriegel, both Plaintiffs communicated with Defendant Eleanor Sclocchini about their leave requests, while Ms. Ash-Heriegel talked to Defendant Ellen Coffee. Thus, even if the type of leave and specific details of the medical evidence alone did not sufficiently distinguish Ms. Ash-Heriegel's situation from that of Plaintiffs, the leave decisions were not made by the same supervisor. There is no allegation that the decisions were dictated by an allegedly discriminatory CHOP policy.

*B. Retaliation*

To establish a prima facie case of retaliation, the plaintiff must show that (1) she engaged in protected activity; (2) she suffered an adverse employment action subsequent to or contemporaneously with such activity; and (3) there is a causal link between the protected activity and the adverse employment action. *See Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 (3d Cir.1997). Defendants argue that Ms. McBride has not identified any adverse employment actions that could be evidence of retaliation. Certainly before this case was filed, there does not appear to be any record evidence that could amount to retaliatory conduct – at most, Ms. McBride was unfairly disciplined, but within five business days of receiving an oral warning for excessive unplanned leave, that discipline was officially reversed.

CHOP acknowledges that Ms. McBride was laid off in February 27, 2015, nearly 3 years after she first complained of discrimination. Obviously, this termination could not have been pleaded in the Complaint, but there has been no motion to amend to include it. Even so, Defendants argue that the length of time between Ms. McBride's complaint of discrimination and her termination suggests that the termination did not result from the complaint. They cite cases that require, in the absence of temporal proximity, additional evidence to imply causation, such as a pattern of antagonism or inconsistent reasons for the termination, *i.e.*, the so-called "timing plus" test. *See Blakney v. City of Philadelphia*, 559 F. App'x 183, 186 (3d Cir. 2014). Defendants argue that there is no evidence of any discrimination that can be linked to her termination.

In opposition, Ms. McBride fails to address this argument. At oral argument, her counsel conceded that the only possible retaliatory action at issue was Ms. McBride's termination, and that the only evidence that could link it to this lawsuit is the fact that of the three people laid off

10

in February, 2015, two were Plaintiffs in this suit at the time of the termination.[7] Even accepting as true this evidence, which does not appear in the summary judgment record filed in this matter, Ms. McBride has not forged a connection between the termination and her protected activity to create a causal link, given the extreme gap in time. Here, there is nothing like the "constant barrage of written and verbal warnings and . . . disciplinary actions, all of which occurred soon after plaintiff's initial complaints," *Robinson v. Se. Pa. Transp. Auth.,* 982 F.2d 892, 894 (3d Cir. 1993), or the "inconsistent reasons" given for termination, *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 280-81 (3d Cir. 2000), that have satisfied the "timing plus" requirement in other cases. Thus, the Court will grant summary judgment on this claim, as well.

**CONCLUSION**

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment. An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

---

[7] In addition to Ms. McBride, Tawanda Johnson was also terminated. Ms. Johnson was originally a plaintiff in this suit, but her claims were voluntarily withdrawn pursuant to a Separation Agreement and Release she signed at the time of her termination.